UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.
05-11850-RGS

```
                                  )
                                  )
                                  )
SHANNON EWING,                    )
     Petitioner,                  )
                                  )
                                  )
     vs.                          )
                                  )
KENNETH W. NELSON,                )
     Respondent.                  )
                                  )
                                  )
                                  )
```

PETITIONER'S MOTION IN OPPOSTION

TO

RESPONDENT KENNETH W. NELSON'S

MOTION TO DISMISS

Now comes the Petitioner, Shannon Ewing, Respectfully serves his Motion in Opposition to Respondent Kenneth W. Nelson's Motion to Dismiss upon this Honorable Court Pursuant to Habeas Corpus Rule 5(e).

(2)

## A. INTRODUCTION

The Petitioner, Shannon Ewing, Was indicted by an Essex County Grand Jury (No. 14183) for Murder (G.L.c 265, § 1) of Americo Scarelli. Petitioner was ried bfore Honorable Robert T. Ronan and a Jury in the Essex County Superior Court on April 6, 1989 to April 14, 1989., Where said Jury Convicted Petitioner of Second Degree Murder and was sentenced to Life Imprisonment with the Possibility of Parole to MCI-Cedar Junction on April 14, 1989.

Petitioner, with the aid of Trial Counsel, Appealed his conviction to the Massachusetts Appeals Court. On March 22, 1991, The Appeals Court affirmed the Conviction. And on April 29, 1991, The Massachusetts Supreme Judicial Court ("SJC") denied Further Appellate Review Pursuant to Mass. R.App.P. 27.1. Soon after appointed Counsel withdrew as Counsel.

Over the next couple of years, Petitioner requested the Trial transcripts from Counsel and on May 12, 1992, Counsel informed Petitioner that Petitioner would have to procure One Hundred dollars for the transcripts. Petitioner told

(3)

Counsel that due to Petitioner's indigency, Petitioner couldn't get the funds. On or about November 3, 1994, Petitioner sent a check to Counsel in the amount of One Hundred dollars. On November 29, 1994, Counsel sent the transcripts together with the check. See (Exhibit A. 1)

On November 21, 1996, Petitioner filed his First pro se Motion for a New Trial Pursuant to Mass.R.Crim.P. 30 accompanied with a Motion for Appointment of Counsel. On January 31, 1997, Honorable Justice Bohn, of the Essex County Superior Court denied the Motion w/o a hearing. On Febuary 18, 1997, Petitioner filed a Notice of Appeal from that judgment. The Appeal was entered in the Appeals Court on May 8, 1997.

On September 16, 1997, The Appeals Court sent Notice of a 17A dismissal. On September 26, 1997, Petitioner filed a Motion for Reinstatement of Appellate Rights. On that same date the Appeals Court allowed that Motion "[A]s only 1st step of 17A dismissal has entered, Appeal not yet dismissed." See (Docket Entries, 97-P-0866 # 3);

On October 27, 1997, Petitioner filed a Motion to "[A]ccept brief as is W/Excess pages." (Docket Entries, 97-P-0866 # 4) On October 28, 1997, Petitioner, Citing his placement is segragation, filed a Motion to proceed on original record

(4)

and for Appointment of Counsel. On October 28, 1997, The
Appeals Court denied Petitioner's three Motions stating
that "[T]here is no right to Counsel in an Appeal such as
this." (Docket Entries, 97-P-0866 # 6).

On October 29, 1997, Petitioner sent a letter to the
Massachusetts Appeals Court explaining Petitioner's Pro se
status and requesting the Court to " Accept briefs as filed.
(Docket Entries, 97-P-0866 # 7), The Court treating W/N as
MTN for Reconsideration is allowed, But, Actions on paper
# 4 & #5 are to stand.

On November 3, 1997, The Appeals Court dismissed
Petitioner's Appellate rights. (Docket Entries, 97-P-0866
# 8) On November 13, 1997, Petitioner filed a Motion for
reconsideration citing his pro se status. On November 14,
1997, The Court stated that APPT shall serve & file B7A
on or before December 16, 1997. and all other request for
relief are denied.

On November 28, 1997, Petitioner sent a letter to the
Appeals Court complaining about his pro se status and in-
ability to file briefs with limited page rule. (Docket
Entries, 97-P-0866 # 9). On November 28, 1997, an order

(5)

was entered giving the Petitioner an "enlargement" of time
to file a brief that cinforms to the Rules of MRCP. (Docket
Entries, 97-P-0866 # 9). On January 6, 1998, The Appeals
Court dismissed Petitioner's Appellate Rights. (Docket Entries,
97-P-0866 # 10).

On April 1 , 2001, Petitioner sent his pro se brief to
the Committee for Public Counsel Service ("CPCS") requesting
them to Appoint Counsel. On April 2, 2001, Petitioner
suffered from a Psychological breakdown and was transferred
to Bridgewater State Hospital for Mental Evlaution Pursuant
to G.L.c 123, § 18(a), See Exhibit A. 2 and A.3., Petitioner
continued to be under a psychological evaluation until
Petitioner was discharged on June 4, 2001. See Exhibit A. 4.

On June 6, 2001, The Commoittee for Public Counsel
Service Appointed an Attorney to "Screen" Petitioner's case
for meritorious issues. See Exhibit A.5. The Screening
Counsel recommened that Appellate Counsel be Appointed to
pursue an Appeal and On December 13, 2001, Counsel entered
in his appearence.(Docket Entries, Spp.Ct # 63) soon after
Newly Appointed Counsel informed Petitioner that he was not
Appointed to pursue Federal Claims and would not "Preseve"

(6)

any Federal Issues for Heabeas Corpus Review. Due to the
fact that Petitioner wanted to preserve all issues, Petitioner
declined any assistence and On October 25, 2002, Petitioner
filed his second pro se Motion for a New Trial with a
Motion for Appointment of Counsel. (Docket Entries, Supt.Ct #
64 and # 65).

On November 5, 2002, The Honorable Bohn of the Essex
County Superior Court denied the Motion W/Out a hearing. On
November 18, 2002, Petitioner filed a Notice of Appeal from
that judgment. On November 21, 2002, The case was entered
in the Appeals Court, (Docket Entries, 02-P-1555 #1)

On November 29, 2002, Petitioner filed, in the Appeals
Court, A Motion for Reinstatement and consoladation of
Appeals Dockets. (Docket Entries, 02-P-1555 # 2). On December
2, 2002, The Appeals Court, Mills, J., denied that Motion.
On January 24, 2003, After weeks of being delusional (Believing
Petitioner was in a CIA conspiracy) Petitioner filed a Motion
for Voluntary Dismissal. (Docket Entries, 02-P-1555 # 6)

On Feburary 24, 2003, Petitioner was admitted to Bridgewater
State Hospital for a second time for Mental evaluation under
G.L.c 123, § 18(a), See Exhibit A. 6. On April 26, 2004, The

(7)

Petitioner file a Motion for Reinstatement of Appellate
Rights and to Consaladate Appeal Dockets. (Docket Entries,
02-P-155 # 9). On May 3, 2004, The Appeals Court, Cohen, J.,
allowed Petitioner's Motion and the Appeal was reinstated
on May 3, 2004. (Docket Entries, 02-P-1555 # 9) after a
few Preliminary Motions, Petitioner filed his brief on
July 12, 2004.

On November 9, 2004, The Commonwealth filed their brief
opposing mine. On April 19, 2005, The Appeals Court (Cypher,
Kantrowitz and Graham, JJ.) denied relief and affirmed the
order denying Petitioner's Motion for A New Trial. On
January 30, 2005, The Massachusetts Supreme Judicial Court
denied Further Appellate Review Pursuant to Mass.RApp.P. 27.1.


## B. ARGUMENT


Prior to the Antiterrorism and Effective Dealth Penalty Act ("AEDPA")
ENACTMENT, "[A] Prisoner faced no strict time constrainst in filing a
Petition for writ of Hebeas Corpus. The AEDPA['s[ [enactment] altered
these circumstances by imposing a One-year limitations period for
habeas Petitions. [F]or Habeas challenges to State Convictions which

(8)

became final prior to the AEDPA's April 24, 1996, Enactment, [all]
circuit[s] affords Petitioner's a One -Year grace period running
from April 24, 1996." Manye vs. Hall,Infra, 122 F.Supp.2d 86 (1st cir.
2000). Thus, The AEDPA's Statute of limitations begin to run, either,
When a Petitioner's Conviction becomes final or when the Judicially
crafted "Grace" period runs out. However, The Statute of limitations
is subject to the doctrine of  Equitable Tolling.

Simply, "[C]ourts should read Prisoner Petition generously,[and]
give them careful consideration, and resolve Statutory ambiquities in
Prisoner's Favor." Kane vs. Winn, 319 F.Supp.2d 162 (D.Mass. 2004);
Neverson vs. Bissonnette, 242 F.Supp.2d 78 (D.Mass. 2003)("Petitioner
. . . [C]annot be held to standard equivalent to those binding an
Attorney."). With that said, The Tolling Provision of § 2244(d)(2)
operates to balance the interest  served by the exhaustion requirement
and the limitations period. The interrelationship "[P]romotes the
exhaustion of State remedies by protecting a State Prisoner's
ability later to apply for Federal habeas relief while State remedies
are being pursued." Duncan vs. Walker, 533 U.S. 167 (2001); Currie
vs. Matesanz, 281 F.3rd 261 (1st cir 2002)("[T]olling Provision complements
the exhuastion requirement.").

(9)

In enacting § 2244(d)(2), "[c]ongress intended to retain the flexibility afforded by the doctrine of Equitable tolling." Young vs. United States, 535 U.S. 43 (2002)("Congress must be presumed to draft limitations period in light of the hornbook law that limitations period are subject to equitable Tolling.").

However, to be entitled to equitable tolling, a Prisoner bears the ultimate burden of establishing a basis for it. The Courts remind litigants that "[E]quitable tolling is normally appropriate only when circumstances beyond a litigant's control prevented [them] from filing on time." Delaney vs. Matesanz, infra, 264 F.3d 7 (1st Cir 2001). In no circumstances can mere inattention or inadvertence establish a basis for equitable tolling.

It can "{b]e invoked only 'sparingly'. It is not available to rescue a litigant from his own lack of due diligence." Neverson vs. Farquharson, 366 F.3d 32 (1st cir. 2004). As apractical matter, "Tolling of the AEDPA's limitation period is Proper: only when the principals of equity would make the rigid application of a limitations period unfair. Generally, This willoccur when the Petitioner has in some extraordinary way been prevented from asserting his Rights. The Petitioner must show that he exercised reasonable diligence in investigating and bring [the] claim. Mere excusable neglect is not sufficient." Chhoeum vs. Shannon, 219 F.Supp.2d 649 (E.D.Pa 2002)("Such impediment might exist'[W]here a State Court simply refuses to Rule on a Constitutional issue'properly before it.").

(10)

The Petitioner contends that the Statute of limitations pursuant to § 2244(d)(2), must be tooled from the daate Petitioner filed his first pro se Motion for a New Trial (Mass.R.Crim.P 30) Until the Massachusetts Supreme Judicial Court ("SJC") rendered their decision in November 30, 2005.

The dearth of case law from this circuit supports Petitioner's contention. First, This circuit has made it abundantly clear that this Court will dispense their authority to equitably toll the limitations in appropiate cases. See Lattimore vs. DuBois, 311 F.3d 46 (1st cir. 2002)(Remanded for tolling question). Petitioner's case displays that appropriateness, From the relavent dates, It is clear that Petitioner tried forcefully to assert his Constitutional rights.

After receiving the Trial transcripts in 1994, Petitioner started to prepare a Motion for New Trial which was filed pro se on November 21, 1996. (Docket entries, Sup.Ct #50) and in doing so, Petitioner acted diligently in pursuing an Appeal from both adverse judgments. The many letters wrote to the Appeals Court complaining of Petitioner's pro se Status and his inability to file a brief. That inability is chronicled in the many letters received on the Docket. See (Docket Entries, 97-P-0866 #3, #4, #5, #6, #7, #8 and #9). The Appeals Court denied Petitioner to file abrief that raised all the arguments.. The

(11)

Petitioner filed all the Proper Motions to bring Petitioner's Appeal
to the Appeals Court, Which all Motions under MassR.App.P. 16(h)
allows Leave to file an "Enlargement of Brief" See Mass.R.App.P. 16(h),
The Appeals Court essentially, Created an UnConstitutional impediment
when the Court denied Petitioner equal access to Massachusetts Appellate
Process. See Douglas vs. California, 372 U.S. 353 (1963)(The Court held
"[T]hat if an Appeal is open to those who can pay for it, An Appeal
must be provided for an indigent" [defendant]); Anders vs. California, 386
U.S. 738 (1967)(same).

    The Appeals Court denied Petitioner equal access to the State's
Appellate Process by denying Petitioner the right to exceed the page
limit and bring all Petitioner's errors in one bag.An Opprotunity
the Appeals Court afford other defendants represented by Counsel. In
Commonwealth vs. Avellar, 416 Mass. 409 (1993), Attorney Wendy Sibbison
was allowed to increase her  brief to 105 pages to adequately  raise
her arguments in the brief. Id and in Commonwealth vs. MacKenzie, 413
Mass. 498 (1992), Attorney Bruce Taub was allowed to increase his brief
to 106 pages to adequately raise seven arguments in his Brief.Id To
deny the Petitioner because Petitioner's not Respresented by Counsel would
Operate as a State created Impediment. The Appeals Court Knew, Under
the Current law, That Petitioner could go no futher if Petitioner
failed to file a Brief raising Petitioner's Constitutional Issues .

    Correctly Stated, "[A] State Prisoner must exhaust his State

(12)

remedies before Prisoner could seek a Federal Habeas Curpus in
Federal Court. See Gaskins vs. Duval, 183 F.3d 8 (1st Cir. 1999), The
Exhaustion doctrine was designed to give the State Courts the First
Bite of the Judicial Apple and the first bite involves the "[F]air
opprotunity to resolve Federal Constitutional claims before those
claims are presented to the Federal forum." O'Sullivan vs. Boerckel,
526 U.S. 838 (1999).

Simply, a Federal claim has to be brought in such a fashion that
the Petitioner is invoking one complete round of the State's Appellate
Process. See Clark vs. Bissonntte, 278 F.Supp.2d 63 (D.Mass. 2003)(
Must complete one full round of State's Appellate Process) To deny
Petitioner to file the brief, where the opprotunity is afforded
represented defendants, would constitute an impediment Pursuant to
§ 2244(d)(1)(B) and would toll the Statute of limitations period until
Petitioner was afforded the Right to Present all his errors in one
Appeal. Nonetheless, Petitioner has been diligently pursuing his
claims by Filing Motions for Reinstatement and Seeking Appointment of
Counsel under their Statutory Provision G.L.c 211D, § 14. At all
times, Petitioner has been attempting to assert his Rights.

In the past year, Several Courts of Appeal have Ruled, Consistently,
that a properly file application for collateral review is indeed
"Pending" during the period that the State Appeal Petition is being

(13)

prepared. See Killela vs. Hall, 84 F.Supp.2d 204 (D.Mass 2000), In

which the First Circuit reitirated that "The term ['Pending'] must

be construed. . . broadly to encompass all the time during which a

State Prisoner is attempting, Through proper use of State Court

Procedures, To exhaust State Court remedies." Id This demonstrates

the flexibility that congress meant to provide to Prisoners who's

"Collateral" issues have not been exhausted\* As the Tenth Circuit

concluded "[W]e conclude the term must be construed more broadly

to encompass all the time during which a State Prisoner is attempting,

through proper use of State Court procedures. See Barnett vs.

Lemaster, 167 F.3d 1321 (10th Cir 1999), and with the spirit of

flexibility, The Statute does not give a precise time when a Petitioner

is actively pursuing to assert his rights, But, The First Circuit

warns against applying a to rigid test. In Currie vs. Matesanz, 281

F.3d 261 (1st Cir 2002), The Court Stated; "[C]ommonwealth argues

that Currie's second New Trial Motion could not possibly have been

'Pending' throughout the Nine-Month period when, To all appearences,

he was not doing anything to pursue an Appeal." Id for the Court

---

\* Collateral Issues in the sense that Issues have not
been raised before in any Court Due to Ineffective
assistence of both Trial and Appellate Counsel.

(14)

applied a "Sensible" Reasoning, " at first blush, that arument seems
sensible; after all, a Petitioner who is not actually in the
legitimate process of Appealing is not 'Attempting' to exhaust State
Court remedies. However, it may not always be obvious whether a
Petitioner was or was not ' in the legitimate process of Appealing'
at any given Moment. It seems doubtful that congress intended
AEDPA's Statute of limitations to turn on evidence that the Petitioner
spent a certain number of hours each day, week, or Month researching
the law, drafting Motions and so on. A Rule that tied the definition
of 'Pending' in § 2244(d)(2) to the time during which the
Petitioner in fact was actively pursuing an Appeal could prove unworkable."
Currie vs. Matesanz, 281 F.3d 261 (1st cir 2002). For all intent and
purposes, The Court should retain the flexibility afford by the
doctrine of equitable tolling and toll all the time a Petitioner is
seeking to exhaust his issue in the State Courts. See Dunker vs.
Bissonnette, 154 F.Supp.2d 95 (D.Mass 2001)(Tolling time in which the
Petitioner is attempting to exhaust his issues.), Simply, This Tolling
period would include all the time Petitioner was incapacitated* at

---

* To include the time tolled for Mental disability
would operate to protect a litigant's interest
and to provide a levle of fairness when dealing
with Statute of limitations. See G.L.c 260, § 7.

(15)

Bridgewater State Hospital on April 2, 2001, Petitioner was still actively asserting his rights through the Committee for Public Counsel Service (CPCS).Simply, Petitioner is, under the circumstances, entitled to equitable Tolling. See Mayne vs. Hall, 122 F.Supp.2d 86 (1st cir 2000)(The most liberally construed facts to establish a basis fpr equitable tolling)

## C. CONCLUSION

This Honorable Court, For the Reasons Set-Out Above, Should Deny Respondent Kenneth W. Nelson's Motion To Dismiss And Order Further Briefing In The Above Docket.

Respectfully Submitted,

Date: 1-17-06

Shannon Ewing, Pro se
Bridgewater State Hospital
20 Administration Rd
Bridgewater, Mass 02324.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SHANNON EWING,                    )          Civil Action No.
    Petitioner,                   )          05-11850-RGS
                                  )
                                  )
        vs.                       )
                                  )
KENNETH W. NELSON,                )
        Respondent.               )
                                  )
                                  )

EXHIBITS IN SUPPORT OF PETITIONER'S MOTION IN OPPOSITION

TO

RESPONDENT KENNETH W. NELSON'S MOTION TO DISMISS

(2)

RECORD  OF  EXHIBITS

EXHIBITS:                                                              Page

Letter from Counsel to the Bar,
January 17, 1995. . . . . . . . . . . . . . . . . . . . . . . . . . A.1

Social Worker Stacy Muise,
Progress Note. . . . . . . . . . . . . . . . . . . . . . . . . . . .A.2

Psychaitric 18(a) Referral,
dated April 2, 2001. . . . . . . . . . . . . . . . . . . . . . . . A.3

Bridgewater State Hospital's
Discharge Summary. . . . . . . . . . . . . . . . . . . . . . . . . A.4

Screening Counsel's Letter
dated July 23, 2001. . . . . . . . . . . . . . . . . . . . . . . . A.5

Dr.Belle's Psy. Evaluation
Conducted July 23, 2003. . . . . . . . . . . . . . . . . . . . . . A.6

## DAVIS, ROBINSON & WHITE

Attorneys at Law
Suite 960
15 Court Square
Boston, Massachusetts 02108
Telephone (617) 723-7339
Fax (617) 723-7731

WILLIE J. DAVIS
FRANCES L. ROBINSON
WILLIAM M. WHITE, JR.                    (Exhibit A.1.)


January 17, 1995


Ellen M. Meagher, Assistant
  Bar Counsel
Board of Bar Overseers
75 Federal Street
Boston, MA  02110

### RE:  BBO FILE NO. B1-94-0554E (SHANNON EWING)

Dear Ms. Meagher:

        The above complaint concerns my failure to provide Ewing with
a copy of the transcript of his trial.  When the request was first
made I needed the original to process the appeal; therefore, I
advised that it would be necessary for it to be copied at his
expense.

        The case was decided by the Appeals Court in 1991.
Comonwealth v. Ewing, 30 Mass. App. Ct. 285 (1991).  Further
appellate review was denied.  Copies of the decision of the Appeals
Court and the denial of further appellate review were forwarded to
him.

        Sometime in November of 1994 I received a check from Ewing for
a copy of the transcript.  At this time the transcript was in
storage.  It has since been retrieved and forwarded to Ewing at MCI
- Cedar Junction, together with his check.

                        Very truly yours,

                        WILLIE J. DAVIS

WJD:s



RECEIVED
JAN 2 3 1995
OFFICE OF
BAR COUNSEL

# CORRECTIONAL MEDICAL SERVICES / UMASS

## PROGRESS NOTES

(Exhibit A.2)

CJ
Institution

NAME: Shannon Ewing.        ID # W46305   D.O.B. 11-29-69

| DATE | TIME | NOTES |
|------|------|-------|
| 4/2/01 | 30 pm (Moise) | (D) PT. seen at cell door or HSU due to refusal to come out-of-cell for interview. PT. being seen due to referral from Nsg. WT. loss of 80 lbs. PT. seen with DR. Berger-Hershkowitz for evaluation of possible delusional D/O. PT. reports that he is HIV (+), even though he has had several (-) test results. PT. explains his thinking due to having false (-), as the virus is concentrated in the lymph Nodes. PT. discussed Religion that does not allow him to receive medical intervention ("The New Christ of God"). PT. reports WT. loss as part of his own organic healing process, although states he eats 3 meals a day. PT. made several conflicting comments around his reasoning, and repeated himself. PT. denied any past MH tx or issues. PT. stated that he felt there wasn't anything we could do to help him. (A) PT. presented with euthymic mood |

# CORRECTIONAL MEDICAL SERVICES / UMASS

## PROGRESS NOTES

C J
_____
Institution

(Exhibit A.2)

NAME: Shannon Ewing    ID # W046305 D.O.B. _____

| DATE | TIME | NOTES |
|------|------|-------|
| 1/2/01 Nurse | Con't | and Congruent affect. PT. was alert, oriented, but presented with delusional Content. ⊖ SI/HI Reported ⊖ nurses, despite LOI loses. |
| | | Ⓟ 18 A in progress to further evaluate for possible delusional D/O. |
| | | Stacey Muir CCS |
| 1/2/01 Nurse | 4:15 pm | admin note - 18A recieved, Pt. to be transported to BSH. all paperwork faxed + Completed. |
| | | Stacey Muise (CS) |

CMS 71138 1/05    MENTAL HEALTH

## Correctional Medical Services/UMMS (DRAFT)
### 18a Referral Form

(Exhibit A.3) ___CJ___
Institution

NAME: Shannon Ewing   ID# W46305   DOB: 11-29-69

**Reason For Referral:** Recently referred by NSG due to ↓ 80 lb. over 1 yr. Pt. States he is HIV ⊕ even though he has had +⊕ test results, refusing to be evaluated medically ? for MH Eva when discussing situation pt. presenting with odd explanations.

**Working Diagnosis:** R/O Delusional D/O. delusional Conte?

**Recent Course:** (including interventions, recent precipitants, mental status, relevant incidents, anniversary issues, personal issues/concerns, legal issues, etc.):

attempted to evaluate out of cell by medical & MH. PT. refused, states he is self healing for ⊕ HIV, PT has several ⊖ HIV tests.

**Current Medications:** ∅

**Questions To Be Addressed:** Possible delusional D/O.

**High Risk Behaviors (self/others):**
PT. has had several altercations with peers over past 18 mths.

**Significant Medical Issues:**
Hx of ⊕ PPD. Currently refusing / recent WT. loss of 20 lbs (8wk 80 lbs over 1yr

**Charge(s):** murder - 2nd - degree.

**Housing Unit Inmate Will Return To:**
☒ Pop ☐ Seg ☐ DDU ☐ Other (specify): Erika Grantber

**Contact Person** Stacey Muise   Tel. # (508) 668-2100 Ext. 156 Beeper (781) 387-8330

**Signature/Title** Stacey Muise) LCSW   Date 4/2/01

For Transfers to Bridgewater State Hospital Please Fax to: 508-279-4832 (FHS) and 617-727-4109 (Nursing Sup.).
Followed by Telephone Notification: 508-279-4500 x 4677, 4678 or 4739 (ITU Nurse)

Original to Medical Record

CMS/UMMS 8044

## BRIDGEWATER STATE HOSPITAL
## DISCHARGE SUMMARY

**PATIENT NAME:**      EWING, SHANNON
**DATE OF BIRTH:**     11/29/69
**BSH#:**              39869
**ADMIT DATE:**        04/02/01      (Exhibit A.4)
**DISCHARGE DATE:**    05/23/01

**ADMITTING DIAGNOSIS (DSM AXIS I-V):**

AXIS I:        Paranoid delusional disorder.

AXIS II:       Deferred.

AXIS III:      1.    History of positive Purified Protein Derivative.
               2.    Recent weight loss.

AXIS IV:       Moderate.

AXIS V:        GAF:  50.
               Highest GAF in Past Year:  60.

**HISTORY OF PRESENT ILLNESS:**

Mr. Ewing was admitted to Bridgewater State Hospital for the first time on April 2, 2001 from MCI-Cedar Junction for an evaluation to determine his need for care and treatment pursuant to the provisions of Chapter 123, Section 18A.  Mr. Ewing is serving a life sentence for murder in the second degree.  The referral note indicated that Mr. Ewing had paranoid delusional beliefs and had lost more than 80 pounds in the past 15 months.  Mr. Ewing was stating that he was HIV positive, even though he had had four negative tests and he was refusing to be medically evaluated and uncooperative with the treatment staff at the prison.  Because of his delusional beliefs and refusal of medical evaluation, he was considered unstable to be adequately cared for in the prison system and was referred to Bridgewater State Hospital.  Mr. Ewing's history indicates suicidal behavior in December 1995 when he cut his right forearm three times, which he attributed to his frustration with the penal system.  Additionally, there is an indication of alcohol abuse and marijuana use beginning in his late teens.  Mr. Ewing has never received any inpatient or outpatient psychiatric treatment and his admission to Bridgewater State Hospital was his first psychiatric hospitalization.

**HOSPITAL COURSE:**

Upon admission, Mr. Ewing presented as alert, oriented, well-organized, but he was very guarded, legalistic, delusional regarding his medical condition, and somewhat paranoid regarding his treatment by the mental health staff, both in the prison and at the hospital.  Throughout the course of his hospitalization, Mr. Ewing consistently stated that he had AIDS, even though there was no medical evidence that he was HIV positive.  Additionally, he refused to cooperate with medical evaluations, denied having any mental illness, and refused any psychiatric medications.  Mr. Ewing enjoyed the relative freedom of Bridgewater State Hospital, being able to go to the law library, walk around in the open air, and remained behaviorally stable through the course of his evaluation.  Mr. Ewing reported adequate appetite, eating his meals, and he had gained 35 pounds by the end of his stay at Bridgewater State Hospital.  The treatment staff and the forensic evaluator saw Mr. Ewing as being mentally ill and needing psychiatric treatment.  Consequently, a petition for his commitment to Bridgewater under Section 18 was filed in Brockton District Court.  However, this petition was denied by the court on May 16, 2001, and consequently, plans were made for Mr.

**PATIENT NAME:**   EWING, SHANNON
**PAGE 2**

---

Ewing's return to prison.          (Exhibit A.4)

**CONDITION ON DISCHARGE:**

At the time of discharge, Mr. Ewing was in good behavioral control, denied any suicidal or homicidal thoughts, socialized appropriately with other patients, and kept busy with legal work and also assisting other patients with their legal issues.  He continued to believe that he was HIV positive in spite of no medical documentation, denied having any mental illness or need for treatment, and advocated for his return to prison because he viewed any psychiatric treatment as negative and prejudicial to his eventual reintegration in the community in the event that he received parole in the future.

**DISCHARGE DIAGNOSIS (DSM AXIS I-V):**

AXIS I:         Psychotic disorder, not otherwise specified versus delusional disorder, somatic type.

AXIS II:        Antisocial personality disorder.

AXIS III:       History of positive Purified Protein Derivative.

AXIS IV:        Moderate.

AXIS V:         GAF:  65.

**DISCHARGE MEDICATIONS:**

None.

**DISCHARGE INSTRUCTIONS:**

Upon his return to prison, Mr. Ewing will need to be monitored by mental health staff regarding his adjustment to the penal environment.

**DISPOSITION:**

Mr. Ewing is scheduled to return back to MCI-Cedar Junction since his petition for commitment to Bridgewater State Hospital under Section 18 was denied by Brockton District Court.

Mariano Merino, LICSW                              5/22/01
Mariano Merino, LICSW                              Date

Louis Hafken, M.D.                                 5/22/01
Attending Psychiatrist                             Date

010/OTI:BSH/064/429654
D: 05/22/01
T: 05/22/01

**Jean M. Fielding**
Attorney At Law

P.O. Box 519
Greenfield, Massachusetts 01302-0519
Telephone (413) 773-5494

(Exhibit A. 5)

July 23, 2001

Mr. Shannon Ewing
MCI-Cedar Junction
P. O. Box 100
South Walpole, MA 02071

Dear Mr. Ewing:

The Committee for Public Counsel Services has asked me to
screen your case for possible merit in a second motion for new
trial or in an effort to revive your appeal from the denial of
your first motion for new trial.   I
    have received a copy of a brief that Attorney Davis drafted
for your direct appeal. I also have a pro se brief that you
apparently drafted intending to appeal the denial of a motion for
new trial. I do not have a copy of the motion for a new trial and
its memorandum yet.
    Attorney also Davis sent the Grand Jury transcripts and some
correspondence and police reports as well.
    To properly review your case, I need the transcripts and the
motion for new trial that you filed and its supporting memorandum
of law.  Do you have these and are you willing to send them to
me? If you do not have them, or cannot send them, I can purchase
them from the Social Law Library, although this usually takes
more time.  Please let me know. Thanks.

Sincerely,

Jean M. Fielding



*The Commonwealth of Massachusetts*
*Committee for Public Counsel Services*
*44 Bromfield Street, Boston, MA 02108*

**WILLIAM J. LEAHY**
CHIEF COUNSEL

TEL: (617) 482-6212
FAX: (617) 988-8495

**PATRICIA A. WYNN**
DEPUTY CHIEF COUNSEL
PRIVATE COUNSEL DIVISION

**ANDREW SILVERMAN**
DEPUTY CHIEF COUNSEL
PUBLIC DEFENDER DIVISION

June 4, 2001

WRITER'S DIRECT DIAL NUMBER

Jean Fielding
P.O. Box 519                        (Exhibit A. 5)
Greenfield, MA 013020519

RE:    Commonwealth v. Shannon Ewing
       Essex Superior Court No(s). 01418
       Screening Assignment

Dear Attorney Fielding:

Thank you for agreeing to review the enclosed matter. Your responsibility is to determine whether there is a reasonable likelihood that the defendant can obtain a real benefit in a lawyered post-conviction proceeding. In making this determination you should consider: 1) a miscarriage of justice may have occurred, 2) the case contains meritorious issues not previously presented to a court, or 3) the defendant, after trial, has not had a direct appeal. After your review, please advise the Chief Counsel in writing whether or not counsel should be appointed. Although your recommendation need not be lengthy, please provide the Chief Counsel with all information and/or considerations (both pro and con) which you think relevant to the question whether to appoint counsel. Your review will be kept strictly confidential unless you choose to contact the defendant in conducting your review.

In the normal course, we would expect to receive your recommendation within sixty (60) days. If you are unable to complete your review within that time, please inform me promptly of the reasons for the delay and your best estimate as to when your review will be completed. Since the defendant is awaiting our response and since, regardless of whether we decide to assign counsel or not, the defendant is unable to proceed either with counsel or pro se until we receive your recommendation. Your cooperation in informing us of any delays is very important.

Please be advised that, upon request of the defendant, we will furnish a copy of your screening letter to the defendant. However, if you have chosen not to disclose your identity to the defendant, we will maintain your confidentiality and will redact any identifying information from your letter.

If you have any questions, please contact me at the above telephone number.

Sincerely,

Denise Simonini
Assignment Coordinator

## BRIDGEWATER STATE HOSPITAL                    1

**EWING, Shannon**                    (Exhibit. A.6)                    **BSH #W46305**

---
### 18(a) EVALUATIION

<u>**July 28, 2003**</u>                    **Gregg A. Belle, Ph.D.**

**IDENTIFYING INFORMATION:** This is the third Bridgewater State Hospital admission for this 33-year-old (DOB: November 29, 1969) African-American male who was admitted on June 26, 2003 from MCI-Cedar Junction for an evaluation to determine his need for care and treatment pursuant to the provisions of M.G.L., Chapter 123, Section 18(a). He is currently serving a Life sentence on the charge of Murder in the Second Degree. Mr. Ewing is eligible for parole on August 16, 2003.

Mr. Ewing was admitted to Bridgewater State Hospital for a second time on February 24, 2003. On April 2, 2003, he was committed for a period not to exceed six months pursuant to the provisions of M.G.L. c. 123, § 18(a). On June 18, 2003, Mr. Ewing returned to MCI-Cedar Junction.

**WARNING ON THE LIMITS OF CONFIDENTIALITY:** At the beginning of the interview, I informed Mr. Ewing that I am a forensic evaluator and that I wanted to examine him, per order of the Court, to gather information that the Court could use in determining his need for further care and treatment. I explained that my observations of him and the information he provided would not be held confidential, but could be included in a written report which I would submit to the Court and/or in oral testimony. I informed Mr. Ewing that he did not have to participate in the evaluation at all, that he could answer questions selectively, and that he could stop the interview at any time. I explained that I would submit a report to the Court whether or not he chose to speak with me.

I then asked Mr. Ewing to repeat the substance of the warning described above. He stated, "This is a limited confidential report to see if I need to stay here or Walpole. I don't have to answer your questions." In my clinical opinion, Mr. Ewing understood the purpose of the evaluation and the limits of confidentiality.

**SOURCES OF INFORMATION:**
1. Interview with Mr. Ewing on July 21, 2003 for approximately 30 minutes.
2. Consultation with Mr. Ewing's Bridgewater State Hospital clinical treatment teams.
3. Review of Mr. Ewing's Bridgewater State Hospital medical and administrative records.
4. Review of Order Of Commitment Of A Prisoner For Observation dated June 26, 2003.
5. Review of Request For Commitment For Observation by Herbert Berger-Hershkowitz, M.D. dated June 26, 2003.
6. Review of 18(a) Referral Form submitted by MCI-Cedar Junction Grishelda Hogan, LCSW dated June 26, 2003.

## BRIDGEWATER STATE HOSPITAL                    2

**EWING, Shannon**                (Exhibit A.6)                **BSH #W46305**

---

### 18(a) EVALUATIION

**July 28, 2003**                                    **Gregg A. Belle, Ph.D.**

7.  Review of my previous §18(a) Bridgewater State Hospital evaluation dated March 26, 2003 that incorporated a review of a §18(a) evaluation by Chad Tillbrook, Ph.D. dated April 30, 2001 and a review of his D.O.C. 6 and 10-part records.

8.  Review of Bridgewater State Hospital Discharge Summary dated June 16, 2003 by Deirdre White, LICSW.

**CIRCUMSTANCES OF ADMISSION:** According to Dr. Berger-Hershkowitz,

> "Patient returned 6/18/03 from Bridgewater State Hospital. He has a psychotic disorder and stopped taking his medication upon his return (resumed last night.) Today he cut his arm and is presenting as increasingly paranoid, disorganized in his thinking and suicidal."

According to information provided by Ms. Hogan, Mr. Ewing does not believe he suffers from a mental illness and cut himself on June 26. She indicated that Mr. Ewing appeared more paranoid and grandiose. Although he agreed to restart medication, he reported that he would not drink or eat.

**PATIENT'S VERSION OF THE CIRCUMSTANCES SURROUNDING TRANSFER:** Mr. Ewing reported that it was a mutual decision between he and his Bridgewater State Hospital clinical treatment team for him to return to prison. He added,

"I thought I could go back and do my time, but I was wrong. When they sent me back. I couldn't find my property. Typical harassment and persecution. They're jealous of me and resentful because I'm hooked up to television and entertainers. The CIA tells people at the jail and c.o.'s to do specific things...trying to satisfy their own jealousy. I couldn't take it there. No canteen, radio, nothing. They wanted me in seg and do nothing. I stopped taking my meds, eating, and drinking because I wanted my live to fail so, I could die and end all of this persecution. I cut up because I wanted out of this world. I want to stay here. I can't make it there."

**RELEVANT HISTORY:** The following indented paragraphs come directly from my March 26, 2003 evaluation. Updated information follows.

> The following indented paragraphs come directly from Dr. Tillbrook's 18(a) Evaluation dated April 30, 2001. Updated information follows.

> The following history was obtained from interviews with Mr. Ewing, a review of his medical records, from conversations conducted with his treatment team at BSH, and those other individuals who had information relevant to the

## BRIDGEWATER STATE HOSPITAL                    3

**EWING, Shannon**                    (Exhibit A.6)                    **BSH #W46305**

### 18(a) EVALUATIION

**July 28, 2003**                                              **Gregg A. Belle, Ph.D.**

evaluation. Mr. Ewing was guarded and uncooperative in providing background information to this examiner. Therefore, much of the following information was obtained from Massachusetts Department of Correction records.

Mr. Ewing, the third of four children, was born on 11/29/69 in Detroit, Michigan. He reported that when he was 1 his family moved to Boston. He reported having a good relationship with his three sisters, but refused to talk about his relationship with his mother. He denied that any member of his immediate family suffered from mental illness or abused substances.

Academically, Mr. Ewing completed a 10th grade education, leaving school "because I chose to work." Throughout most of his schooling, he was enrolled in special education classes for several classes "particularly math." He reported receiving average grades and denied repeating any grades or classes. He also denied ever being suspended or expelled. Mr. Ewing reported that prior to his offense he was employed as a cashier. He indicated that his longest job lasted only five months removing asbestos, and that he was last employed as a cashier just prior to his arrest. He attributed the unsteadiness of his work experience to being laid off frequently or "maybe fired." He denied any difficulty with his co-workers or employers.

Mr. Ewing has never married but reported that he fathered a child. He told a BSH treatment team member that he was a "single father of a reportedly deceased 6 year old daughter." He refused to discuss any issues that related to previous relationships or current social supports. The inmate indicated that for several years he has maintained affiliation with the International House of Christ, reportedly a religious organization with the nearest house of worship in Santa Fe, New Mexico. Mr. Ewing reported that he heard of this religious group while incarcerated and that he has been maintained mail correspondence with other members. He reported that their religious proclamations are "based on a freedom to make choices, with conditions based on spiritual growth and individual attunement." He also reported that this religious organization advocates for holistic medicines including aromatherapy and reflexology.

Mr. Ewing reported that until recently, his medical history has been unremarkable. He denied having any significant head injuries, loss of consciousness, or suffering from a seizure disorder. He reported having arthroscopic surgery in his right knee in 1991, he denied having any complications with the surgery or persistent pain associated with this injury. Mr.

## BRIDGEWATER STATE HOSPITAL                                4

**EWING, Shannon**                    (Exhibit A. 6)                    **BSH #W46305**

### 18(a) EVALUATIION

<u>**July 28, 2003**</u>                                               **Gregg A. Belle, Ph.D.**

Ewing had a positive PPD finding (a skin test that assessed whether someone has been exposed to tuberculosis) in 1993. As a result, he was treated with medications (INH) from 11/93 to 5/94, and his last chest x-ray in 6/98 was "within normal limits." He has refused additional chest x-ray and PPD monitoring since mid-1998. In addition, he has had significant weight loss recently considering that he is six feet, three inches tall. According to Dr. Berger-Hershtiowitz's progress note that accompanied the inmate on admission, Mr. Ewing has lost 82 pounds with in the last 15 months with a 22 pound loss in the last 10 months. A chart review revealed the following measurements: 7/98 – 234 lbs., 8/99 – 230 lbs., 1/00 – 244 lbs., 1/01 – 185 lbs., and 4/01 – 163 lbs. Mr. Ewing does not see why there has been so much concern over his weight loss. He reported that he consumed all of his meals at MCI-CJ and that he has not intentional lost weight (i.e., dieting), but he has decreased the amount of snacks he eats, because in his opinion eating "junk food...[could] lead to further deterioration."

Reportedly, Mr. Ewing has never received inpatient or outpatient psychiatric treatment, or been prescribed any psychotropic medications. During a MCI intake procedure on 4/17/89, Mr. Ewing complained of sleep difficulties and expressed an interest in individual "treatment for depression and severe stress experienced by incarceration," but the following week he was ambivalent about individual therapy and treatment never began. As described below in the MCI records, Mr. Ewing cut his right forearm three times with a disposable razor blade in 12/95 as a suicide gesture. From the available records, it appears that he was treated medically for the injury but he was not referred to mental health services. When I questioned Mr. Ewing about this gesture, he minimized the significance of the event stating, "It was out of frustration. I had no avenue to vent my dissatisfaction. I was frustrated with the political scene in this country. With the movement that was going to take away social welfare and social security." He was not able to explain his rationale or how he anticipated that cutting his forearm was going to influence these political and social policy issues.

Mr. Ewing was evasive when questioned about his history of substance use. He reported that he began drinking alcohol at age 17. He described his drinking as "never [been] a problem. I'm a moderate drinker only on occasion." The inmate reported that he has occasionally smoked marijuana beginning at age 17. He was unwilling to elaborate on the frequency or extent of his use. He denied experimentation or consistent usage of other illegal drugs. He denied having

## BRIDGEWATER STATE HOSPITAL 5

**EWING, Shannon** (Exhibit A.6) **BSH #W46305**

### 18(a) EVALUATIION

**July 28, 2003** **Gregg A. Belle, Ph.D.**

ever participated in a detoxification or community-based, substance abuse treatment program.

He reported that prior to the index offense, he never had any interactions with the criminal justice system. However, according Mr. Ewing's Massachusetts Criminal History Summary of Adult Appearances, Mr. Ewing has been arrested for motor vehicle offenses (operating after suspended license (twice), compulsory insurance violation (twice), attaching wrong plates), Malicious Destruction of Property (twice), and Larceny of a Motor Vehicle. He served a 10-day sentence for some motor vehicle offense in 6/87, and a 60-day incarceration with an additional probationary sentence for the larceny charge in 9/87.

In context of discussing the circumstances that lead to his current life sentence, Mr. Ewing reported that even though he was eligible for parole in two years (MCI records indicate 4/02), he would never opt for this opportunity. He stated, "It's a conditional release. Your freedom is taken away. Your freedom to travel anywhere at anytime is gone. I'd rather have those rules placed on me in prison than out there [in the community]." Initially, Mr. Ewing described his adjustment to prison as "Good, usually." When questioned about the numerous disciplinary reports he received and his numerous transfers among institutions because of his behavior, he stated, "I figure it's normal." He minimized the severity of his violent infractions, "I had a fight or so, but not many. Usually out of place, or in the wrong part of the housing [unit]." The details of his adjustment to prison have been reported in his DOC record, and more adequately summarized in a classification report as follows.

Mr. Ewing is serving his first state, second adult incarceration of Life 2nd for Murder, 2nd. Inmate Ewing's adjustment on his current incarceration has been extremely poor with the receipt of 95 d-reports (disciplinary reports), 3 RTHS, 3 lateral transfers, and 1 DDU placement.

Subject was sentenced and committed to MCI-CJ on 4/14/89 and later transferred to MCI-Concord for initial classification and transferred to MCI-CJ on 9/1/89. Inmate Ewing received d-reports for assaulting a CO (Correctional Officer) in the dinning hall by throwing a plastic knife at his chest, and for threatening officers on two occasions. On 3/4/91 subject incurred a d-report for assaulting staff by intentionally walking into a CO in the corridor. Inmate Ewing also incurred a d-report for assaulting

## BRIDGEWATER STATE HOSPITAL                6

**EWING, Shannon**                    (Exhibit A.6)                    **BSH #W46305**

### 18(a) EVALUATIION

**July 28, 2003**                                          **Gregg A. Belle, Ph.D.**

inmate [KW] on 10/22/90. Inmate Ewing was transferred to NCCI on 6/27/91, where his adjustment did not improve, incurring d-reports for conduct which disrupts, insolence to staff, and being out of place. Subject was RTHC at MCI-CJ on 8/21/91 for a d-report he incurred on 8/20/91 for brushing up against a female CO. While housed at MCI-Concord, he continued to incur d-reports of an assaultive nature: fighting with inmate [LW] assaulting a CO by grabbing his arm through the bars on his cell, assaulting staff with an unknown liquid substances, and assaulting staff with a meal tray.

Inmate Ewing was transferred to Old Colony Correctional Center on 1/5/94, where he incurred 5 d-reports in a 2-month period. Infractions included not standing for count, insolence to staff, being out of place, disruptive conduct, and for calling the nurse a bitch. Subject was RTHC at MCI-CJ on 3/7/94. Inmate Ewing's behavior remained disruptive and assaultive after his return to MCI-CJ. He incurred d-reports for breaking his cell window, for assaulting inmate [CB] in the chow hall by punching and kicking him, and assaulting a CO with a razor-type weapon, a razor blade attached to a toothbrush. During the assault, inmate Ewing cut the officer's hand. For this offense subject incurred a 12-month DDU sanction, during which his adjustment was adequate.

Upon his release to population from DDU on 9/17/95, Ewing incurred 2 d-reports for self-mutilation (12/12/95 and 12/16/95) when he cut his wrists with razors removed from disposable razors. Subject was transferred MCI-Shirley medium on 1/22/96, where he fought with inmate [AB] on 6/4/96.

Inmate Ewing was then transferred to NCCI. While housed there, he incurred a d-report for filing a false tax return for $887. Subject also received a d-report assaulting inmate [RK] on 5/26/97. On 7/3/97, inmate Ewing was transferred to MCI-Norfolk, where he incurred a d-report for threatening an officer stating, "I'd like to get my hands on you and throw you around." Subject was RTHC on 7/8/98 to MCI-CJ, where he incurred d-reports for possession of 16" piece of flatstock on 8/7/98 and for threatening inmate [HS] on 8/18/98. Subject assaulted a CO while housed in EWSU by shoving his shoulder into a CO's chest.

Inmate Ewing was transferred to Souza-Baranowski Correctional Center (SBCC) on 11/9/98 due to renovations at MCI-CJ. While housed at SBCC,

## BRIDGEWATER STATE HOSPITAL 7

**EWING, Shannon**        (Exhibit A.6)        **BSH #W46305**

### 18(a) EVALUATIION

**July 28, 2003**        **Gregg A. Belle, Ph.D.**

inmate Ewing's adjustment was extremely poor. He incurred d-reports ranging from refusing to enter population and not standing for count to insolence to staff and assaulting staff. In one incident, Ewing pulled restraints away from staff while they were removing them and attempted to punch a CO during a strip search. Inmate Ewing was returned to MCI-CJ on 8/17/99.

Since his return to Walpole, Ewing has incurred d-reports for fighting with inmates; threatening staff, refusing a housing assignment, and refusing to clean his cell bars. Ewing also had segregation placements resulting from one of the fights, threatening a nurse, and the most recent from the fight another inmate on 2/3/01.

Mr. Ewing's first Bridgewater State Hospital admission was on April 2, 2001 pursuant to the provisions of M.G.L., Chapter 123, Section 18(a). According to Dr. Tillbrook's report, Mr. Ewing was admitted due to paranoid delusions about medical issues, and "his refusal to be evaluated medically and his lack of insight into his need for mental health treatment was placing his life at risk." Mr. Ewing had lost 80 pounds over a 15-month period. In addition, Mr. Ewing was convinced that he was HIV positive although he had four negative tests. Dr. Tillbrook opined, "Mr. Ewing is suffering from a Delusional Disorder primarily manifested by fixed, irrational somatic beliefs (i.e., that he is HIV positive without confirmation from medical tests) and grandiose beliefs (i.e., that he has inflated self-worth that his actions can institute significant social and political change). In addition he presents with a longstanding history of antisocial behavior as exhibited by his failure to conform to rules and regulations, irritability and aggressiveness, disregard for the safety of others, and indifference toward mistreating others."

Dr. Tillbrook opined that "His inability to care for himself without close supervision and monitoring, and that his disregard for his own health if left untreated would pose a substantial risk of harm to himself and others." Dr. Tillbrook indicated that returning Mr. Ewing to MCI-Cedar Junction was "clinically contraindicated" and petition for Mr. Ewing's commitment pursuant to the provisions of Section 18(a) was filed. However, on May 16, 2001, this petition was denied and Mr. Ewing was returned to Cedar Junction the following week.

Mr. Ewing's second admission to Bridgewater State Hospital pursuant to the provisions of M.G.L. c. 123, § 18(a) was on February 24, 2003. In prison, he had been placed on mental health watch after cutting his arm and leg, and refusing medical treatment. Mr. Ewing was inconsistent with

## BRIDGEWATER STATE HOSPITAL                                    8

**EWING, Shannon**                      (Exhibit A.6)                      **BSH #W46305**

_____

### 18(a) EVALUATIION

<u>**July 28, 2003**</u>                                                  **Gregg A. Belle, Ph.D.**


his medication compliance and became increasingly delusional about the CIA and religion. I opined that Mr. Ewing suffered from a mental illness best characterized as Delusional Disorder, Persecutory Type. He exhibited acute psychotic symptomatology such as persecutory delusions about the CIA and DOC, a somatic delusion that he has AIDS despite multiple negative test results, and grandiosity (i.e., believing that he has special powers in which he can see into the future, can decide who can go into heaven and hell, and the world will end when he dies). Mr. Ewing also has a fatalistic belief that he will die in 2003 and that he should have died "a long time ago."

As previously mentioned, Mr. Ewing was committed on April 2, 2003 for a period not to exceed six months pursuant to the provisions of M.G.L. c. 123, § 18(a). According to Ms. White's discharge summary, Mr. Ewing resided on a minimum-security housing unit, worked in the kitchen, and was medication compliant. She described him as in good behavioral control and denied any suicidal ideation or homicidal ideation upon discharge. Ms. White added, "However, he does not attend treatment groups at this time. Continues to believe that he is infected with the AIDS virus; however, reports that he feels free of symptoms. He also feels that the CIA is harassing him, but cannot or would not elaborate. He appears future oriented and eager to return to prison."

**COURSE OF HOSPITALIZATION:** Mr. Ewing was admitted to this facility on the evening of June 26, 2003 and housed on the Intensive Treatment Unit (ITU) per hospital protocol. He refused the first eight meals of this admission and eventually agreed on June 29 to consume Resource (dietary supplement). During this time, Mr. Ewing periodically refused to meet with mental health staff for rounds. On June 30, he was transferred to the more restrictive/admission unit (B-1).

On July 1, Mr. Ewing's case administrator Shannon Costello, LCSW, reported that when she asked him why he stopped taking his meds in prison, he replied, "I'm fed up with this bullshit. They persecute me, steal my property, all because they're jealous that I'm connected to the TV and radio. They're jealous that I make the celebrities laugh and that I talk to Gwen Stefani (rock star)." She described his speech as "more rapid and loud," and noted that he was tangential, grandiose, paranoid, and delusional. On July 7, he was transferred to the least restrictive admissions/observation unit (B-2) where he has remained throughout the course of his hospitalization.

On July 10, Ms. Costello reported that Mr. Ewing informed her "when he dies the will world end and everybody knows that. Patient spoke of his wish for this to happen, but states that it cannot happen at BSH." She noted that he believes that he is a political prisoner and that "politicians cannot help him because they are devil worshipers." On July 18, Ms. Costello reported that Mr.

## BRIDGEWATER STATE HOSPITAL                    9

**EWING, Shannon**                (Exhibit A.6)                **BSH #W46305**

_____

### 18(a) EVALUATIION

**July 28, 2003**                                **Gregg A. Belle, Ph.D.**

Ewing believes that he is immortal "and should have been dead many times." He acknowledged improved mood and asked for an increase in psychotropic medication. She reported that he is unable to identify the benefits from Seroquel (antipsychotic). Ms. Costello characterized his mood as expansive with animated affect, "content of speech grandiose/delusional." She stated that Mr. Ewing has passive suicidal ideation, but is able to contract for safety. In addition, "patient motivated to stay at Bridgewater State Hospital to 'avoid persecution.'"

### CURRENT MEDICATIONS:

1.    Seroquel (antipsychotic) 500 mg at bedtime.
2.    Prozac (antidepressant) 40 mg in the morning.

Mr. Ewing has been medication compliant throughout his course of hospitalization.

**CURRENT MENTAL FUNCTIONING:** Mr. Ewing is an African-American male of tall, thin build who appears his chronological age of 33. His hygiene and grooming appear to be adequate as he was dressed in appropriate hospital attire. Mr. Ewing was pleasant and cooperative and made good eye contact. In addition, he displayed normal movements and mannerisms. Mr. Ewing's speech was pressured and at times, it was difficult to understand him. He was able to establish sufficient rapport for the purposes of the current evaluation and this was easily maintained.

Mr. Ewing reported no disturbances with his mood and his affect (emotional expression) was somewhat elevated particularly when he talked about the conspiracy involving the CIA and the "special powers" he possesses. Although Mr. Ewing presently denied feeling depressed, he does endorse feelings of hopelessness and worthlessness about the future "due to this CIA conspiracy." He stated that he is "suffering from the CIA campaign to persecute me." Mr. Ewing also demonstrated a grandiose, inflated sense of self. He commented that he has special powers in which he can see the future. Mr. Ewing boasted that he defeated the devil in 1998 and he can determine who goes to heaven or hell. He reported that he can communicate with entertainers on television and has "relationships" with them. Mr. Ewing added, "I'm hooked up with people in tv and music."

Mr. Ewing was alert and oriented to time, knew who he was, and where he was. He denied any current suicidal ideation, homicidal ideation, or intent. However, the content of his thoughts consisted of the fatalistic notion that he will die at some point this year. When asked why he believed he would die this year, he replied, "Because of the number 33. It's my favorite number. It's the number that Patrick Ewing (a former NBA player) used to wear. As soon as I kept seeing

**BRIDGEWATER STATE HOSPITAL**                                        10

**EWING, Shannon**                    (Exhibit A.6)                   **BSH #W46305**

---

### 18(a) EVALUATIION

**July 28, 2003**                                          **Gregg A. Belle, Ph.D.**

this number I knew that the world would end in 2003 because the world will end when I die." He continued this fatalistic notion when asked his thoughts regarding parole. Mr. Ewing stated,

> "I'm not going to get it because the persecution is still going on. If I leave, I'd have access to guns, cyanide, or I could travel to a civil war country to become more powerful. I'd probably last one week on the outside because I control when I die and then the world would end. I want the world to end because there is too much evil in the world. I don't see a free America like others. If I leave (on parole) I'd have complete control of when I die. If I stay here (or prison) I wouldn't have weapons accessible to me."

Mr. Ewing vehemently denied having any delusions (false, fixed beliefs); however, he discussed a conspiracy involving the CIA that has affected his life since he was 6-months old. He expressed that he no longer wants to see his family because he believes that they also are affiliated with the CIA. Mr. Ewing reported that he believes the CIA has influenced the DOC to "subtly harass me by poisoning my food over a prolonged period of time to make me paranoid." He also alleged that the DOC has given him AIDS and that it is not documented in his medical record because "the DOC changed my papers." Mr. Ewing denied experiencing any auditory hallucinations, denied that he can read the minds of other people, and denied that other people can either hear and/or steal his thoughts. Mr. Ewing does not believe he has a mental illness and is only taking medication because he feels "It helps me relax." His thoughts were clear and coherent and he demonstrated no difficulties with attention, concentration, or memory, as he was able to recall information discussed in previous meetings.

**CLINICAL IMPRESSIONS REGARDING NEED FOR CARE AND TREATMENT:** In my clinical opinion, Mr. Ewing suffers from a mental illness best characterized as Schizoaffective Disorder. He presently suffers from a substantial disorder of mood, thought, and perception that grossly impairs his judgment, behavior, and capacity to recognize reality as defined by relevant Department of Mental Health regulations. Mr. Ewing continues to exhibit acute psychotic symptomatology such as persecutory delusions about the CIA and DOC, a somatic delusion that he has AIDS despite multiple negative test results, and grandiosity (i.e., believing that he has special powers in which he can see into the future, can decide who can go into heaven and hell, and the world will end when he dies). He has a fatalistic belief that he will die in 2003 and that he should have died "a long time ago."

In my clinical opinion, Mr. Ewing continues to pose a substantial risk of harm to himself and others by reason of mental illness and requires further inpatient psychiatric hospitalization within the strict security of Bridgewater State Hospital. Mr. Ewing has no insight into his mental illness and minimal understanding that his psychiatric medications are to treat symptoms of his mental

**BRIDGEWATER STATE HOSPITAL**                11

**EWING, Shannon**                    (Exhibit A.6)                **BSH #W46305**

---

### 18(a) EVALUATIION

**July 28, 2003**                                        **Gregg A. Belle, Ph.D.**

illness, not just to relax him. Although Mr. Ewing has not engaged in self-injurious or assaultive behaviors here at the hospital, he has a history of engaging in these acts in prison as evidenced by his history of suicidal gestures, disregard for medical treatment particularly after losing 80 pounds in 15 months in 2001, and history of assaulting and threatening correctional staff in prison.

It is my opinion that returning Mr. Ewing to a penal environment at this time will exacerbate acute symptoms of his mental illness and increase the likelihood that he will engage in self-injurious behaviors. After returning to prison on June 18, 2003, he returned to Bridgewater State Hospital eight days later, had stopped eating in hopes that his liver functioning would fail, cut himself, and stopped taking his medication. A petition for Mr. Ewing's commitment to Bridgewater State Hospital, pursuant to M.G.L., Chapter 123, Section 18(a) has been submitted.

**Gregg A. Belle, Ph.D.**
**Forensic Evaluator**

Read and Reviewed by:
**Ira K. Packer, Ph.D. ABPP (Forensic)**
**Director, Forensic Services**